UNITED DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
NORTHERN DIVISION

JERRY WAYNE HARRIS,               )
                                  )
            Plaintiff,            )
                                  )
vs.                               )       Case No. 2:06CV00034 AGF
                                  )
MICHAEL J. ASTRUE,[1]             )
Commissioner of Social Security,  )
                                  )
            Defendant.            )

## MEMORANDUM AND ORDER

This action is before this Court[2] for judicial review of the final decision of the

Commissioner of Social Security denying Plaintiff Jerry Wayne Harris's application for

Supplemental Security Income under Title XVI of the Social Security Act, 42 U.S.C.

§§ 1381-1383f.   For the reasons set forth below, the decision of the Commissioner shall

be reversed and the case remanded for further consideration.

Plaintiff, who was born on August 14, 1968, applied for benefits on July 9, 2004,

at the age of 35, with a protective filing date of June 2, 2004.  He claimed a disability

onset date of August 18, 2001, due to cognitive disorder, borderline intellectual

---

[1]    Michael J. Astrue became the Commissioner of Social Security on February 12, 2007.
Pursuant to Rule 25(d)(1) of the Federal Rules of Civil Procedure, Michael J. Astrue is here
substituted for Commissioner Jo Anne B. Barnhart as Defendant in this suit.  No further
action needs to be taken to continue this suit by reason of the last sentence of Section 205(g)
of the Social Security Act, 42 U.S.C. § 405(g).

[2]    The parties have consented to the exercise of authority by the undersigned United States
Magistrate Judge under 28 U.S.C. § 636(c).

functioning, an adjustment disorder, posttraumatic stress disorder ("PTSD"), and left vocal cord paralysis.  After his application was denied at the initial administrative level, Plaintiff requested a hearing before an Administrative Law Judge ("ALJ").  A hearing was held on August 11, 2005, at which Plaintiff was represented by counsel.  On December 13, 2005, the ALJ issued a decision that Plaintiff was not disabled.  The Appeals Council of the Social Security Administration ("SSA") denied Plaintiff's request for review on May 5, 2006.  Plaintiff has thus exhausted all administrative remedies and the ALJ's decision stands as the final agency action.  Tr. at 113-119, 120-177.

Plaintiff argues that the ALJ erred by failing to give proper weight to the opinions of Plaintiff's treating counselors (Robert Berger and Veneta Raboin) with regard to his mental impairments and in relying instead on the testimony of a non-examining medical expert ("ME"), who misread the record.  Plaintiff requests that the decision of the Commissioner be reversed and the case remanded for the award of benefits, or alternatively, for further proceedings and a new decision.

**<u>Work History</u>**

Plaintiff indicated on a form submitted in anticipation of the evidentiary hearing that he worked from May 1987 to September 1998 as a house painter.  He left this job because his partner moved out of town.  Plaintiff worked between July 1998 and December 1998 at a dog kennel, feeding dogs, and as a general handyman.  Plaintiff indicated that he left this job because he could not agree with his boss.  Tr. at 109.

Plaintiff's earnings record shows minimal wages from 1995 through 1998, and no earnings thereafter. Tr. at 68.

**Medical Record**

On August 18, 2001, Plaintiff was taken to the emergency room ("ER") after a car accident. The ER notes state that Plaintiff was the unrestrained driver in a head-on collision with another vehicle, that he hit his anterior neck on the steering wheel, and that he arrived at the ER with significant strider and respiratory distress. The notes also state that Plaintiff denied any loss of consciousness, and was alert, oriented, and able to speak despite his injuries. Blunt trauma to the head was noted, as was a "fairly large area of abrasion on the left upper forehead with no gross deformity." Tr. at 113-14. Plaintiff was hospitalized until August 24, 2001, when he was discharged in stable condition, with Coumadin (an anti-coagulant) having reached a therapeutic level. The discharge report diagnosed multiple system trauma, laryngeal trauma, a right carotid intimal tear, grade II liver laceration, and duodenal hematoma. Tr. at 120-22.

On October 4, 2001, a CT examination of Plaintiff's head showed "a very subtle low density in the posterior limb of the right internal capsule," which was considered "an equivocal finding." It was noted that an MRI might be helpful. Tr. at 195. On October 8, 2001, Plaintiff presented to a Trauma Clinic with complaints of left lower extremity weakness which Plaintiff believed was due to a panic attack. Plaintiff was informed that this may have been a transient ischemic attack ("TIA"). Ultrasonagraphy failed to show any abnormality, and Plaintiff refused to have an angiogram. Tr. at 181.

On December 11, 2001, Plaintiff was seen for chronic hoarseness, and breathing difficulties. Upon examination, it was noted that Plaintiff's left vocal cord was immobile, but that there was a slight chance that function would return. When Plaintiff was seen on July 9, 2002, for follow-up, he reported that his voice fatigued if he used it extensively and that he had problems with increased volume. Examination showed that Plaintiff's left cord was still immobile. He was told that there was not much more that could be done for him. He was encouraged to stop smoking, and to follow up on an as-needed basis. Tr. at 207-09.

When Plaintiff saw George Comfort, M.D., his treating physician, on June 26, 2003, Plaintiff complained of lower back pain radiating down both legs. He was helping his wife with her paper route, but could only work two or three hours a day. Plaintiff reported that he smoked a pack of cigarettes a day, was irritable, and angered easily. Dr. Comfort noted chronic back pain and recommended that Plaintiff undergo a disability evaluation, adding that he was not sure if Plaintiff would be eligible. Tr. at 202-03.

On March 9, 2004, Plaintiff was seen for evaluation of "a stroke." Plaintiff reported that over the last few years, he had shortness of breath when he did "pretty much any work." It was noted that Plaintiff continued to smoke heavily. The examining doctor believed that a significant amount of Plaintiff's shortness of breath and stamina problems were most likely related to lung issues rather than to a lack of airway in his larynx, and he encouraged Plaintiff to see a pulmonologist. Tr. at 205.

On May 11, 2004, Plaintiff discussed his increased anger levels with Steven Taylor, M.D., Plaintiff's treating physician at the time. Dr. Taylor noted that Plaintiff complained of anxiety, and anger over "small things." Dr. Taylor also noted that Plaintiff was working as a part-time mechanic. Dr. Taylor assessed dysthemia and anger problems, prescribed Lexapro (a drug used to treat depression and anxiety), refilled Plaintiff's prescription for Clonazepam (an anticonvulsant sometime prescribed for anxiety disorders), and referred Plaintiff to the Arthur Center, a behavioral health services clinic. Tr. at 227.

On July 8, 2004, Robert Berger, a licensed clinical social worker at the Arthur Center, filled out a master treatment plan for Plaintiff. Mr. Berger noted that after Plaintiff's car accident, he had difficulty breathing, would get frustrated and anxious, and angered very easily when he could not do the things he used to do. Mr. Berger reported that Plaintiff swore and threw things when angry. The plan indicated that Plaintiff would be finished with therapy when he came to terms with his limitations, could better manage the expression of anger, had reduced anxiety, and achieved adequate income. Mr. Berger estimated that this would take approximately one year. He also stated that further evaluation of Plaintiff's medications was needed. Plaintiff was diagnosed with generalized anxiety disorder with regard to his frustration and anger and was given a

Global Assessment of Functioning ("GAF") score of 50, indicating "serious" impairment in social and/or occupational function.[3]  Tr. at 223-24.

Plaintiff stated in the July 18, 2004 Function Report filled out with his wife's help and submitted with his application for disability benefits, that he helped his wife three and one-half to four hours a day (driving her on her paper route) and then napped until supper.  Plaintiff indicated in check box form that he had no problem with personal care, but that he needed reminders to care for his personal needs and grooming, and to take medications on time and in the correct amounts.  Plaintiff indicated that he was able to do some household chores like vacuuming twice a week for 20 minutes, mowing once a month for two and one-half hours, and doing some repairs.  He indicated that he could not perform these activities without stopping to catch his breath.  Tr. at 69-71.

Plaintiff wrote that he went outside every day, that he could do this alone, that he could drive a car, and that he could handle finances.  On occasion he would go shopping with his wife.  He did not have an interest in engaging in his hobbies (cars and home improvement) because he knew it would cause him pain.  Plaintiff also wrote that one or two times a month he would sit and talk or watch TV with others.  He also indicated

---

[3]      A GAF score represents a clinician's judgment of an individual's overall ability to function in social, school, or occupational settings, not including impairments due to physical or environmental limitations.  Am. Psychiatric Ass'n, Diagnostic & Statistical Manual of Mental Disorders 32 (4th ed.).  GAF scores of 31-40 indicate "major" impairment in these functional areas; scores of 41-50 reflect "serious" impairment; scores of 51-60 indicate "moderate" impairment; scores of 61-70 indicate "mild" impairment.  Id.

problems getting along with others because he had an "irritated and anxious attitude." He wrote that he was quiet, except when angry, and kept to himself. Tr. at 72-74.

Plaintiff indicated that he could follow spoken better than written instructions, did not get along with authority figures well, but had not been laid off from a job because of problems with others. He wrote that he became angry and impatient under stress, had no tolerance for others, became nervous and upset with changes in routine, had developed an unusual fear of choking, and was withdrawn, depressed, anxious, and angry. Tr. at 75-76.

In progress notes dated July 19, 2004, Mr. Berger opined that the major cause of Plaintiff's "disability" was his shortness of breath, but that he also had a very low frustration tolerance and associated fits of rage. Mr. Berger also noted Plaintiff's emotional liability, which was often symptomatic of neurological damage, something that had not been ruled out as a contributing factor to Plaintiff's problems. Tr. at 221-22.

Also on July 19, 2004, Plaintiff's wife filled out a third-party Function Report regarding Plaintiff's impairments. Mrs. Harris's description of Plaintiff's condition mirrored the description on his own function report. Mrs. Harris indicated that Plaintiff had to rest a lot while mowing the lawn and could not breathe after vacuuming. According to Mrs. Harris, Plaintiff handled stress with a "big screaming cursing punching breaking of things episode" and did not handle changes in routine well. Tr. at 79-84.

When Plaintiff saw Dr. Taylor on July 19, 2004, Plaintiff complained that Clonazepam made him excessively sleepy. He also complained of depression and

decreased appetite and energy. Dr. Taylor diagnosed depression, instructed Plaintiff to take his Clonazepam in the afternoon, prescribed Zoloft (an anti-depressant), and recommended that Plaintiff see a psychiatrist and apply for disability. Tr. at 226.

On July 23, 2004, Veneta Raboin, R.N./MHCNS (mental health clinical nurse specialist) at the Arthur Center, prepared a psychiatric evaluation of Plaintiff, which was co-signed by John Hall, M.D., to whom Plaintiff was referred for medication evaluation. The Court will refer to Nurse Raboin as the author of the evaluation. She reported that Plaintiff's presenting problem was anger outbursts, and that he identified the August 2001 car accident as the beginning of his problems. Plaintiff reported that since the accident, he could no longer do work on a timely basis because he would become very winded and fatigued. Currently he and his wife were on food stamps and Medicaid.

Plaintiff reported to Nurse Raboin that he had run out of his medications on July 5, 2004, and did not take any until his Clonazepam was refilled by Dr. Taylor on July 19. During this two-week period, Plaintiff became increasingly agitated and had a couple of incidents where he lost his temper and punched a hole in the wall. Nurse Raboin noted that since Plaintiff was back on Clonazepam, his mood improved significantly. Nurse Raboin opined that Plaintiff's three greatest stressors were his anger, inability to work as he once had, and lack of money. Tr. at 281-82.

Nurse Raboin reported that Plaintiff was alert and oriented to person and place, had good eye contact, his thoughts were easy to follow, and his voice had a normal tone without indication of shortness of breath. Nurse Raboin noted that Plaintiff reported

anger on a regular basis, and incidents of upturning a table and punching a hole in the wall, after which he would be remorseful. Plaintiff acknowledged feelings of depression, hopelessness, helplessness and anxiety. He felt that his memory and intelligence had returned to pre-accident levels. Tr. at 282-83.

Nurse Raboin diagnosed Plaintiff with generalized anxiety disorder, panic disorder, possible neurological impairment, and intermittent explosive disorder. She assigned Plaintiff a current and past year GAF of 50, and recommended that Plaintiff continue counseling with Mr. Berger. Plaintiff was directed to take Paxil (an anti-depressant) in the morning, Clonazepam twice a day, and start Risperdal (a psychotropic agent used to treat anxiety and depression, among other disorders) twice a day for agitation and temper. Tr. at 283-84.

The record includes medication/progress notes from Nurse Raboin from September 4, 2004, through July 27, 2005, documenting Plaintiff's visits, which were first on a bi-monthly basis, and then on a monthly basis. These notes were co-signed by Dr. Hall. Again, the court will refer to Nurse Raboin as the author of these notes. According to the September 4, 2004 notes, Plaintiff reported that he was "doing okay," but Nurse Raboin observed that he looked unkempt, smelled a little, had a flat affect, and looked depressed. Plaintiff had not taken any of his medications for one week, stopping the Clonazepam "cold turkey" because he felt drugged. Plaintiff was alert and oriented, he slept about six hours at night, his appetite varied, and his mood was labile. Ms. Raboin recommended that Plaintiff restart Risperdal slowly and that an anti-depressant be added. Tr. at 289.

Plaintiff visited Janice Brockus, a speech therapist, on September 8, 2004, for his voice disorder (dysphonia).  Ms. Brockus concluded that Plaintiff's ability to produce audible, sustained, and understandable speech would be mildly affected for everyday tasks and moderately affected after sustained physical activity.  Tr. at 230A.

On September 18, 2004, Plaintiff reported to Nurse Raboin that he was not doing any better, was still irritable, and had periods of anger and explosiveness.  This was confirmed by Plaintiff's wife.  Nurse Raboin noted that Plaintiff was alert, with a flat affect.  Plaintiff reported that Risperdal was causing nausea and diarrhea, and Nurse Raboin, upon consultation with Dr. Hall, told Plaintiff to discontinue taking it.  Nurse Raboin noted Plaintiff's sensitivity to medications.  Tr. at 290.

On September 23, 2004, licensed psychologist Patrick Finder, Ph.D., examined Plaintiff as a consultant for the state disability determinations agency.  Dr. Finder observed that Plaintiff presented with a "very angry" affect, walked stiffly, avoided almost all eye contact, and occasionally struggled to hold back his tears.  Plaintiff reported that "things were okay in his life" until the August 2001 accident.  Dr. Finder noted that Plaintiff started to cry as he recounted the story of the accident.  According to Plaintiff, his head hit and shattered the windshield, and he was unconscious for a "brief period of time."   When he came to, he crawled out of his vehicle, made it to the side of the road, and fell.  His sons and wife were also in the car, but were only minimally injured.  Plaintiff stated that he could not work after the accident because he could not breathe properly, and tired quickly.  He reported that he also could no longer do the

handyman and car repair work that he used to do all the time for himself and acquaintances.  Dr. Finder observed that Plaintiff talked with a very raspy voice.  Plaintiff told Dr. Finder that he helped out a little around the house and drove his wife on her paper route, but did little else because of his physical health conditions.  Despite current mental health treatment, Plaintiff continued to experience pronounced symptoms of depression.  He was extremely angry that his throat was not going to improve, and he had lost about 20 pounds in recent months because he did not feel like eating.  Tr. at 239-43.

Plaintiff stated that he did not have anger problems prior to the accident.  Dr. Finder wrote that it was difficult to say whether the increase in irritability was due to a head injury or to depression.  Plaintiff also reported symptoms of posttraumatic stress related to the accident, acknowledging intrusive memories, flashbacks, nightmares, specific triggers for the memories, and an exaggerated startle response.  Dr. Finder diagnosed major depression, recurrent, moderate, and PTSD, both secondary to the accident and Plaintiff's subsequent inability to work.  Dr. Finder assessed Plaintiff's GAF as 50 and noted that the possibility of a traumatic brain injury ("TBI") could not be ruled out.  Tr. at 243-44.

Dr. Finder opined that Plaintiff could understand and remember instructions, but that Plaintiff's ability to concentrate was significantly impaired.  Dr. Finder noted that Plaintiff was oriented as to person and place, but was disoriented as to day and date, and was only able to recall five digits in a forward fashion.  Plaintiff had difficulty in interacting socially due to a significant increase in irritability.  Dr. Finder noted that prior

to the accident Plaintiff got along well with everyone, but currently he avoided most people except his immediate family.  Tr. at 244.

Paul Stuve, Ph.D., a non-examining state agency psychologist, completed a Psychiatric Review Technique form on October 4, 2004, evaluating the presence/severity of affective disorders (Listing 12.04) and anxiety related disorders (Listing 12.06), based upon the Commissioner's listings of these disorders.[4]  Dr. Stuve believed that Plaintiff had major depression as a medically determinable impairment.  Dr. Stuve indicated that as a result of Plaintiff's mental disorders, Plaintiff had mild limitations with respect to activities of daily living, and maintaining concentration, persistence, and pace; moderate limitations with respect to social functioning; and no limitations due to repeated episodes of extended-duration decompensation.  He thus concluded that Plaintiff did not meet the B criteria of the two disorders in question.  Dr. Stuve found that the evidence did not

---

[4]   The Commissioner's regulations list disorders that are presumed to be disabling if certain criteria are met or medically equaled.  20 C.F.R. Pt. 404, Subpt. P, "Appendix I'.  The listings for affective mood disorders (Listing 12.04) and for anxiety related disorders (Listing 12.06) set forth three criteria, "A," "B, and "C."  The required level of severity for Listing 12.04 is met when A and B are met, or when C is met.  The required level of severity for Listing 12.06 is met when A and B are met, or when A and C are met.

For B to be met in each of these listings, the individual must have marked difficulty in at least two of three functional areas (daily living, social functioning, and maintaining concentration, persistence, or pace), or marked difficulty in at least one of these areas plus repeated episodes of decompensation, each of extended duration.  For Listing 12.04, C is a chronic affective disorder of at least two years duration, with the presence of certain enumerated characteristics, that more than minimally affects functioning even under treatment.  For Listing 12.06, C is the complete inability to function independently outside one's home.

establish the presence of the C criteria. He indicated that Plaintiff's impairments were severe but not expected to last 12 months. In narrative form, Dr. Stuve wrote that the record showed that Plaintiff was just beginning treatment for his mental impairments, was expected to improve "within the coming year," and would then be capable of performing simple work. Tr. at 246-58.

Dr. Stuve also filled out a Mental RFC Assessment based upon his review of the record. Dr. Stuve indicated in check-box form that Plaintiff's understanding and memory, sustained concentration and persistence, and adaptation were not significantly limited in any regard. Plaintiff was moderately limited in two areas of social interaction, namely, in his ability to interact appropriately with the general public, and in his ability to accept instructions and respond appropriately to criticism from supervisors. In narrative form, Dr. Stuve opined that by July 8, 2005, Plaintiff would be capable of understanding and remembering simple instructions, would have moderate difficulty interacting with the general public and accepting criticism from supervisors, and would be capable of relating adequately to coworkers. Tr. at 260-62.

When Plaintiff saw Nurse Raboin on October 15, 2004, he reported that he could not handle "all the stress," and that he had broken out the back window of his car in an anger outburst. He reported that his medication was "doing ok," and that he was taking it, however he continued to be excitable, angry, and with a quick temper. He reported being cited by police for being too loud. Nurse Raboin observed that Plaintiff looked gaunt and somewhat dirty, was alert, and had a poor appetite. Tr. at 291.

On December 4, 2004, Nurse Raboin observed that Plaintiff had not been involved in any physical altercations since his last appointment, and was compliant with his medications. He was alert and oriented, but looked discouraged, was still irritable and short tempered, was frustrated at multiple obstacles, and appeared to be more depressed. Nurse Raboin recommended increasing Carbatol (an anti-epileptic agent) and Prozac (an anti-depressant). Tr. at 292. On December 17, 2004, Plaintiff reported that he was doing well, and Nurse Raboin noted that Plaintiff was more animated, spontaneous, and hopeful. Plaintiff reported having a temper outburst a few days before because he could not find his wallet, but otherwise both he and his wife felt that he was doing better. Nurse Raboin recommended a decrease in Plaintiff's Carbatol because he was sleeping too much. Tr. at 293.

When Plaintiff saw Nurse Raboin on January 7, 2005, he reported an incident of flared anger. Plaintiff also reported that at first he thought his Prozac was working, but currently he believed that it was causing nervousness, anxiety, and insomnia. Nurse Raboin observed that Plaintiff had good eye contact and was spontaneous. He reported having fewer temper outbursts, but remained easily angered and frustrated, especially if he was unable to locate what he wanted. Nurse Raboin recommended discontinuing Prozac and starting Buspirone for anxiety and panic. Tr. at 294.

On January 28, 2005, Plaintiff reported that he stopped taking Buspirone after one week because it caused headaches. He reported that Tegrital (an anticonvulsant) was helping him and that he had only one outburst since his last appointment – an argument

14

with his brother-in-law, who was later arrested by the police and hung himself in jail. Nurse Raboin, noting that Plaintiff remained very sensitive to medications, increased Plaintiff's Tegrital, stated that Lithium (used to treat bi-polar disorder) might be considered for Plaintiff's aggression, and noted Plaintiff's poor medical compliance. Tr. at 294A.

On February 19, 2005, Plaintiff reported that he was doing well and had had no explosive incidents since the prior month. Nurse Raboin noted that Plaintiff was alert, and oriented, although he admitted to depression, and was still sad over the loss of his brother-in-law. Nurse Raboin recommended adding Zyprexa (a mood stabilizer), noting that Plaintiff had tried several medication changes with poor response, but still requested additional medication trials. During his March 19, 2005 follow-up, Plaintiff reported that he was irritable the prior week and had difficulty sleeping, and that the Zyprexa had little effect. Nurse Raboin increased Zyprexa and prescribed Trazodone to help him sleep. On April 14, 2005, Plaintiff reported that he was doing better since the Zyprexa increase, was pleased with his Tegrital, and was sleeping much better. Nurse Raboin reported that Plaintiff was alert, his appearance was good, he "looked so much better" and smiled several times, and his speech was good with a normal tone. Tr. at 295-97.

Mr. Berger's progress notes from April 20, 2005, indicated that Plaintiff had improved mood and behavior. Plaintiff was able to handle a number of frustrating experiences centered around car repairs without major loss of temper. Plaintiff reported that he did not have problems sleeping because he took Trazodone. Mr. Berger's April

15

27, May 4, and May 11, 2005 notes indicated that Plaintiff had improved mood and

behavior. The May 11 notes state that Plaintiff started laughing about a joke, could not

stop laughing, and then began to cry. Mr. Berger speculated that this may have been

related to the build-up of tension regarding Plaintiff's anger toward his alcoholic father

and frustration over a lawsuit related to his August 2001 accident. Mr. Berger wrote that

this emotional lability was also characteristic of neurological damage. On May 18, 2005,

Mr. Berger noted that Plaintiff had improved mood and behavior. Mr. Berger observed

that Plaintiff had problems making decisions and that Plaintiff reported sleep difficulties,

anxiety and panic attacks, and problems motivating himself to do things. Tr. at 310-14.

Mr. Berger completed a Medical Assessment of Plaintiff's Ability to do Work-

Related Activities (Mental), based on an examination on May 26, 2005. Mr. Berger

indicated that Plaintiff's ability was "fair"[5] or "poor or none" in all areas of making

occupational adjustments; making performance adjustments such as carrying out even

simple job instructions; and making personal-social adjustments. Mr. Berger wrote that

Plaintiff had not been able to find a neurologist to examine him because of his pending

legal suit from the August 2001 accident. Mr. Berger noted that Plaintiff was

unconscious for a day after the accident, and he opined that Plaintiff suffered a closed

head injury, which may have caused some neurological damage. Plaintiff suffered from

depression and anxiety, but Mr. Berger noted that these symptoms had improved

---

[5]    "Fair" was defined on the form as, "Ability to function in this area is seriously limited
but not precluded."  Tr. at 285.

somewhat, but that Plaintiff had low stress and frustration tolerance, his emotions were variable, he cried easily, went into blind rages over small frustrations, and could not perform the complex mechanical work he once performed at a superior level. Mr. Berger wrote that based upon his own observations and those of Plaintiff's wife, Plaintiff was likely to quickly withdraw from stressful situations or explode in anger. Mr. Berger wrote that Plaintiff was able to drive the car for his wife's paper route, and could do some automotive mechanical work, but at a very restricted pace, "not adequate for a work situation." Plaintiff was able to manage benefits in his own best interest and did not need a guardian. Tr. at 285-86.

On June 4, 2005, Nurse Raboin also filled out a Medical Assessment of Plaintiff's Ability to do Work-Related Activities (Mental). She indicated in checkbox format that Plaintiff had poor or no ability to make occupational adjustments; poor or no ability to understand, remember, and carry out any form of job instructions; and poor or no ability to make personal-social adjustments. She noted that prior to Plaintiff's August 2001 accident, Plaintiff did odd jobs, but that he had not worked after the accident. Plaintiff experienced intense anxiety, was easily frustrated, had poor impulse control, became intensely angry, and occasionally had physical altercations. Ms. Raboin highlighted Plaintiff's poor insight, judgment, and comprehension, and stated that Plaintiff was depressed with poor general well-being. Nurse Raboin wrote that Plaintiff's anger and frustration could result in assaultive behavior. Furthermore, she believed that Plaintiff was unable to complete tasks required for employment. Plaintiff was easily frustrated by

his limitations and had poor self-esteem related to the deterioration of his abilities, though Plaintiff was able to manage benefits in his own best interest.  Tr. at 287-88.

Mr. Berger observed in his progress notes dated June 2 and June 23, 2005, that Plaintiff's mood and behavior had improved, and that Plaintiff was in a "pretty good mood" during his June 23 appointment.  On June 30, 2005, Mr. Berger noted that Plaintiff had an improved mood, but noted that Plaintiff "got into it" with a dog control officer and lost his temper, the officer called the police, and Plaintiff narrowly avoided being taken to jail.  He diagnosed Plaintiff with intermittent explosive disorder.  On July 7, 2005, Mr. Berger again noted an improved mood, and again diagnosed Plaintiff with intermittent explosive disorder.  Tr. at 304-09.

On July 15, 2005, Ahmad Hooshmand, M.D., an examining neurologist, reported to Dr. Taylor that Plaintiff stated that when he thought about happy things he wanted to cry.  Plaintiff reported to Dr. Hooshmand that his problems began with the August 2001 accident.  Dr. Hooshmand noted that some of Plaintiff's statements about the accident contradicted the report of discharge from the hospital, such as his report of unconsciousness, while the discharge report stated that he was conscious upon the arrival of paramedics at the scene.  Dr. Hooshmand wrote that according to Plaintiff, his Carbatrol did not help control his outbursts.  Tr. at 298.

Dr. Hooshmand reported that Plaintiff stated that he became frustrated when he could not do his job as a mechanic.  He tried to break things he was supposed to fix, and remained angry for an hour afterwards.  An evaluation of Plaintiff's nervous system

showed that he was oriented to self, place, and time. During the interview, Plaintiff had poor eye contact and a few crying episodes. Plaintiff's speech had no dysarthria (poor articulation), dysphasia (impaired content of speech), or dysphonia (hoarseness). Dr. Hooshmand stated that Plaintiff's presentation was suggestive of explosive mood disorder, etiology undetermined, and of depression. Dr. Hooshmand recommended an MRI of Plaintiff's brain, referral to a head injury unit, and an evaluation of his medical history and behavior prior to the August 2001 accident. Tr. at 298-300.

On July 16, 2005, Plaintiff saw Ms. Raboin, who observed that Plaintiff was alert, oriented, had temper and attitude issues, had a decreased appetite, and slept well. Plaintiff reported a verbal altercation with an animal control officer, who accused him of not caring for his dogs and took them away from him. Ms. Raboin continued Plaintiff's Carbatrol, Trazodone, and added Hydroxyzine (an anti-anxiety drug) and Lithium. Tr. at 303.

On July 19, 2005, Mr. Berger noted that Plaintiff had an improved mood, and was working detailing cars, which Mr. Berger noted was "just the right avenue" for Plaintiff. Mr. Berger diagnosed intermittent explosive disorder. Tr. at 302.

Plaintiff saw Ms. Raboin on July 27, 2005, and reported that he had not experienced any new temper outbursts, and had no noticeable side effects from the Lithium. Plaintiff was continued on Carbatrol, Lithium, and Tegrital. Tr. at 301.

On October 24, 2005, Plaintiff underwent a neurophysiological evaluation by Brick Johnstone, Ph.D., to determine Plaintiff's cognitive strengths and weaknesses

related to injuries incurred in the August 2001 accident.  Plaintiff told Dr. Johnstone that he hit his head on the windshield and was then ejected from the vehicle.  Plaintiff reported that he lost consciousness briefly.  Dr. Johnstone noted the discrepancies between this account and medical records which indicated that Plaintiff had extricated himself from the vehicle and that he did not lose consciousness.   Dr. Johnstone observed that Plaintiff was dressed and groomed appropriately, and was pleasant and cooperative throughout the evaluation, was alert and generally oriented, though he appeared impatient and frustrated at times.  Plaintiff's thought process was logical and goal-oriented; his speech was normal in volume, rate, and prosidy.  He frequently had problems understanding directions during testing and directions were repeated often.  He appeared to work to the best of his ability and Dr. Johnstone considered the results of his evaluation to be valid.  Tr. at 321-23.

Psychological stressors, like his financial difficulties and unemployment, hindered his recovery and Dr. Johnstone opined that, since it had been more than one year after Plaintiff's injury, Plaintiff had already made the majority of his recovery.  IQ Testing indicated that Plaintiff had "highly variable cognitive abilities," with significant relative weaknesses in verbal/language skills, including language based learning disabilities in reading and spelling related to longstanding neurological weaknesses, and significant relative strengths in visual-spatial skills.  Specifically, Plaintiff's test results indicated a verbal IQ of 69 ("extremely low"), borderline to low average verbal memory, relatively strong visual-spatial skills, and average visual spatial intelligence.  His performance IQ

was 90 ("average").  Plaintiff also showed indications of global neurophysiological
impairments (like declined higher cortical skills and irritability) which were likely related
to his TBI (traumatic brain injury).  Plaintiff was diagnosed with generalized anxiety
disorder, panic disorder, and possible neurologic impairment.  Dr. Johnstone opined that
pharmaceutical management of Plaintiff's depression and agitation would likely improve
his overall functioning, and that Plaintiff would benefit from counseling from a therapist
knowledgeable regarding TBI.  Dr. Johnstone suggested numerous methods Plaintiff
could use to deal with his anger management problems, his concentration problems, and
his expressive language skill weakness.   Dr. Johnstone further stated that Plaintiff would
benefit from state vocational rehabilitation programs to obtain assistance in returning to
work.  However, any vocational placement would have to account for his physical
limitations, verbal weaknesses, significant learning disabilities, and other TBI limitations.
As such, Plaintiff would be best suited for repetitive tasks, like painting, which were not
speed dependent or academic and he would benefit from non-verbal presentation of
information.  Tr. at 323-26.

**Evidentiary Hearing of August 11, 2005**

Plaintiff and a VE testified at the hearing, and Richard Watts, M.D. testified by
phone as an ME.  Plaintiff, represented by counsel, testified that he was 36 years old and
had a ninth grade education.  Plaintiff stated that he tried to work in the spring of 2005 as
a mechanic, but could only work for one day because he took too long completing the
job.  He also tried working on friends' cars or houses but could not finish those jobs.

21

Plaintiff helped his wife with her paper route by taking turns driving the car with her three or four times a week.  Plaintiff reported that his last regular job was at a dog kennel where he worked for one year in 1997 or 1998 doing general maintenance and carpentry work.  Before that, he was a house painter for about 17 years and would lift an 80 pound ladder.  He owned 40% of the painting business for the last three of the 17 years.  Tr. at 332-36.

Plaintiff testified that he only helped his wife for three or four days a week because he did not like to go out in public and did not like dealing with people.  He further testified that his anxiety was caused by going out or dealing with people when he did not want to.  When asked about his depression, Plaintiff explained that he cried and thought about hurting the person that "did what they did to me," referring to his August 2001 car accident.  Plaintiff explained that the depression began about a year after the car accident, because doctors told him that his condition would improve and it did not.  Tr. at 337-38.

When asked by his attorney to discuss his anger outbursts, Plaintiff explained that the outbursts were brought on when someone called or looked at him.  He referenced his run-ins with the dog catcher.  Plaintiff described that he exploded, could not remember three or four of his anger episodes, and threw things.  He felt embarrassed by these episodes.  They were also brought on by money issues, inability to do what he previously could, and breathing difficulties.  He sometimes experienced crying episodes due to his

depression. Plaintiff believed that counseling did not help with his problem because he continued to get angry. Tr. at 338-40.

Plaintiff testified that his breathing problems were related to a crushed esophagus and paralyzed vocal cord, which were caused by the August 2001 accident. He stated that he became fatigued lifting and carrying five or ten pounds across a room, and could not complete repair projects he began for friends. The fumes from chemicals, gas, oil, and household products made one side of his nose run and gave him headaches. He also stated that he could not complete these tasks because he lacked patience, and would get angry and break the object he was working on. Tr. at 341-42.

Plaintiff testified that he became angry before the accident, but not at the same levels as at the time of the hearing, and that he was much more patient before the accident. Plaintiff explained that he saw Ms. Raboin for six months, once a week. He smoked one cigarette per hour and lost 20 pounds since the accident because he did not eat as well as he should. Plaintiff explained that he experienced acid reflux from his stress, and that eating made him dizzy and lose balance. Plaintiff also explained that he had a pending lawsuit concerning his accident and that he had to have some testing related to that. Tr. at 344-46.

The ALJ then called the ME to testify about Plaintiff's condition. The ME summarized Plaintiff's medical records, beginning with the accident in August 2001. The ME opined, based upon Ms. Brockus' notes, that Plaintiff's voice would begin to trail during heavy work, but would maintain its usual volume if he were sitting doing

paperwork. The results of Plaintiff's breathing tests were "well above" the relevant listing of a deemed-disabling impairment in the Commissioner's regulations. The ME further opined that Plaintiff had shown psychological improvement after counseling. The ALJ asked the ME whether Plaintiff met or medically equaled any listing for disability that would last for 12 months or more, and the ME replied negatively. Tr. at 352-55.

According to the ME, Dr. Finder's September 23, 2004 report of Plaintiff's psychological condition indicated that Plaintiff's ability to concentrate was impaired in complex situations. Upon questioning by Plaintiff's attorney, the ME acknowledged that Plaintiff's disorientation as to day and date, as noted by Dr. Finder, involved simple, rather than complex matters. The ME testified that there was no evidence in the record of any severe brain injury. He stated that hospital personnel wanted to perform a brain CT scan soon after the accident, but that Plaintiff refused. The ME speculated that an MRI of Plaintiff brain would not show any such injury because no symptoms of brain injury were apparent. Tr. at 355-59.

Plaintiff's attorney then questioned the ME about Plaintiff's GAF score of 50. The ME stated that this score implied "moderate" impairment in terms of psychological factors and daily activities. Upon further questioning, the ME corrected this statement, acknowledging that a GAF of 50 indicated "serious" symptoms. The ME stated that Plaintiff's counselors (Mr. Berger and Nurse Raboin) reported four months prior to the hearing that Plaintiff was "doing much better." When asked by Plaintiff's counsel about Ms. Raboin's June 4, 2005 Mental RFC form indicating that Plaintiff had severe

symptoms, the ME stated, "Oh, dear, where is that in the record?"  As Plaintiff's attorney

began describing the report, the ME stated "That was what I reported, yeah."  (In fact, the

ME did not mention Ms. Raboin's report in his earlier testimony).  The ALJ interposed at

this point that a counselor was not an "acceptable medical source," but just an "other

source" under the Commissioner's regulations.  Tr. at 360-62.

The VE was asked whether a person who needed to avoid interacting with the

public could perform Plaintiff's past jobs as a kennel attendant or painter.  The VE stated

that both positions would require occasional interaction with the public, but that most of

the time the work could be done without public or co-worker interaction.  The ALJ then

asked whether someone of Plaintiff's age, education, and work experience, who had no

exertional limitations, was limited to very brief talking with strenuous activity, had to

avoid interaction with the public, and was able to follow simple and "low end detailed

instructions" could perform any work.  The VE stated that there were painting positions

such an individual could perform, such as new home construction painting where the

individual would not have to speak with the owners, and only with the contractor.  The

VE further opined that the hypothetical individual could perform medium level unskilled

positions, such as kitchen helper, order picker, or materials handler; light level positions

such as assembler and light level laundry worker; and sedentary jobs, such as assembly

worker and photofinisher.  Upon further questioning, the VE testified that if the

individual were capable of "superficial" interaction with the public, the person could

perform Plaintiff's past work.  Tr. at 366-68.

Plaintiff's attorney asked the VE how her assessment would change if the hypothetical person's ability to concentrate were significantly impaired, and the VE responded that the person would not be able to maintain any employment. The attorney asked how a GAF score of 50 would change her assessment, and the VE stated that the hypothetical person would have difficulty maintaining employment. Tr. at 368-69.

**Post-Hearing Evidence**

By letter dated August 15, 2005, Plaintiff's counsel told Dr. Hall that the ALJ indicated that he would not give great weight to Mr. Berger and Nurse Raboin's medical assessment forms because they were just social workers. Counsel told Dr. Hall that it would be helpful to Plaintiff's disability claim if he would countersign one or both of those forms and return them to counsel. Dr. Hall returned the forms as countersigned by him and stated that he had a collaborative agreement with Nurse Raboin and that it was "completely appropriate" for him to cosign her work. He further wrote that he was "very familiar" with Mr. Berger's work. Tr. at 320.

**ALJ's Decision of February 16, 2006**

The ALJ found that Plaintiff's cognitive disorder, borderline intellectual functioning, adjustment disorder, PTSD, and left vocal chord paralysis were severe impairments, but that "the combined clinical findings" indicated that these impairments did not, individually or in combination, meet or medically equal the criteria of a presumed-disabling impairment listed in the Commissioner's regulations. Tr. at 16.

The ALJ reviewed the ME's testimony in some detail, noting that the ME opined that overall Plaintiff made a very good recovery from the August 2001 motor vehicle accident; that there were no significant problems with Plaintiff's exhalation; that although Plaintiff's voice was not loud, it was intelligible; and that Plaintiff's speech was mildly affected with respect to daily tasks, and moderately affected secondary to fatigue. Tr. at 17-18.

Regarding Plaintiff's mental condition, the ALJ noted the ME's testimony that treatment records from the Arthur Center from September 2004 to April 2005 reported an improvement in Plaintiff's mental condition with treatment at that facility. The ALJ also noted the ME's testimony that Plaintiff had no symptoms of brain injury. The ALJ stated that he found the testimony of the ME to be credible and consistent with the record. The ALJ mentioned that although Plaintiff's August 2001 ER report showed that he was alert, oriented, and able to speak at the scene of the accident, Plaintiff claimed more serious injuries in his subsequent reports to counselors and physicians. The ALJ stated that Nurse Raboin's psychiatric evaluation of Plaintiff on July 23, 2004, was based mostly on Plaintiff's reported history, and that Plaintiff's mental condition "significantly improved" with treatment thereafter. Furthermore, the ALJ found it significant that Dr. Johnstone recommended that Plaintiff contact vocational rehabilitation to obtain assistance in returning to work, and did not find that Plaintiff was disabled from all types of gainful employment. Tr. at 18-19.

The ALJ stated that Plaintiff's mental health counselors, Mr. Berger and Ms. Raboin, were not "acceptable medical sources" under the Commissioner's regulations. The ALJ stated that the opinions of the counselors and of Dr. Hall, who co-signed their assessments, were inconsistent with the totality of the medical evidence, and that the counselors and Dr. Hall rendered opinions on the ultimate issue of disability, a decision which was reserved for the Commissioner. The ALJ stated that accordingly, he would give little weight to these opinions. On the other hand, the ALJ determined that the Dr. Stuve's opinions would be accorded weight, and they were "consistent with and supported by the findings, opinions, and conclusions of treating and examining medical sources contained in the record." Tr. at 19-20.

The ALJ then assessed Plaintiff's RFC to determine whether Plaintiff could perform his past relevant work or, if not, other work, citing Polaski v. Heckler, 739 F.2d 1320 (8th Cir. 1984), for the relevant factors in evaluating the credibility of Plaintiff's subjective complaints. The ALJ determined that Plaintiff's testimony with respect to the severity of his overall medical condition and inability to work was not supported by the totality of the medical evidence, or by Mrs. Harris's Function Report. The ALJ characterized that report as stating that Plaintiff assisted her on her paper route, was able to take care of his personal needs, and did the mowing and vacuuming--all activities which the ALJ believed showed that all types of gainful employment were not precluded. In addition, the ALJ believed that Plaintiff's sporadic work history with low earnings was not indicative of an individual with a strong motivation to work. Tr. at 20-21.

The ALJ again stated that Plaintiff's mental condition significantly improved with treatment and that some of the mental treatment opinions in the record "appeared to be greatly influenced" by Plaintiff's reports of more severe injuries from the August 2001 accident than the medical record actually indicated. The ALJ reviewed Dr. Stuve's October 4, 2004 evaluation, accepted Dr. Stuve's findings with regard to Plaintiff's functional limitations, and "agree[d] with his finding that Plaintiff would not be precluded from all types of competitive employment." The ALJ concluded that the limitations noted by Dr. Stuve would not preclude work involving no interaction with the general public, nor work involving simple and "low end detailed" instructions. The ALJ determined that Plaintiff's RFC had no exertional limitations, but that Plaintiff was limited to brief talking with strenuous activity, needed to avoid interaction with the public, and could follow simple and low-end detailed instructions. Tr. at 21-22.

The ALJ determined that Plaintiff could not preform his past relevant work. The ALJ recognized that the burden shifted to the Commissioner to prove that Plaintiff could perform other jobs that existed in significant numbers in the economy. The ALJ reviewed the VE's testimony that an individual with Plaintiff's age ("younger individual"), education ("limited"), past relevant work, and RFC could perform sedentary, light, and medium unskilled jobs. Some of these jobs included assembler (sedentary, unskilled), photofinisher (sedentary, unskilled), assembler (light, unskilled), laundry worker (light, unskilled), kitchen helper (medium, unskilled), order picker (medium, unskilled), and materials handler (medium, unskilled), all of which existed in significant numbers.

Consequently, the ALJ determined that Plaintiff could perform other work and, as such, Plaintiff was not disabled and had not been under a disability during the relevant time period. Tr. at 22-23.

## DISCUSSION

### Standard of Review and Statutory Framework

In reviewing the denial of Social Security disability benefits, a court must affirm the Commissioner's decision "so long as it conforms to the law and is supported by substantial evidence on the record as a whole." Reed v. Barnhart, 399 F.3d 917, 920 (8th Cir. 2005) (quotation omitted). This "entails 'a more scrutinizing analysis'" than the substantial evidence standard. Id. (quoting Wilson v. Sullivan, 886 F.2d 172, 175 (8th Cir. 1989)). The court's review "'is more than an examination of the record for the existence of substantial evidence in support of the Commissioner's decision'"; the court must "'also take into account whatever in the record fairly detracts from that decision.'" Id. (quoting Haley v. Massanari, 258 F.3d 742, 747 (8th Cir. 2001)). Reversal is not warranted, however, "'merely because substantial evidence would have supported an opposite decision.'" Id. (quoting Shannon v. Chater, 54 F.3d 484, 486 (8th Cir.1995)).

To be entitled to benefits, a claimant must demonstrate an inability to engage in any substantial gainful activity which exists in the national economy, by reason of a medically determinable physical or mental impairment which has lasted or can be expected to last for not less than 12 months. 42 U.S.C. § 423(d)(1)(A). Work which

exists in the national economy "means work which exists in significant numbers either in the region where such individual lives or in several regions of the country." Id. § 423(d)(2)(A). Both the impairment and the inability to engage in substantial gainful employment must last or be expected to last for not less than 12 months. Barnhart v. Walton, 535 U.S. 212, 217-22 (2002).

The Commissioner has promulgated regulations, found at 20 C.F.R. § 416.920, establishing a five-step sequential evaluation process to determine disability. The Commissioner begins by deciding whether the claimant is engaged in substantial gainful activity. If so, benefits are denied. If not, the Commissioner decides whether the claimant has a "severe" impairment or combination of impairments. A severe impairment is one which significantly limits a person's physical or mental ability to do basic work activities. 20 C.F.R. § 416.921(a).

A special technique is used to determine the severity of mental disorders. This technique calls for rating the claimant's degree of limitations in four areas of functioning: activities of daily living; social functioning; concentration, persistence, or pace; and episodes of decompensation. Id. § 416.920a(c)(3).

If the claimant does not have a severe impairment that meets the duration requirement, the claim is denied. If the impairment is severe and meets the duration requirement, the Commissioner determines at step three whether the claimant's impairment meets or is equal to one of the impairments listed in Appendix I. If the claimant's impairment is equivalent to a listed impairment, the claimant is conclusively

presumed to be disabled.  Otherwise, the Commissioner asks at step four whether the claimant has the RFC to perform his past relevant work, if any.  If the claimant has past relevant work and is able to perform it, he is not disabled.  If he cannot perform his past relevant work or has no past relevant work, the burden of proof shifts at step five to the Commissioner to demonstrate that the claimant retains the RFC to perform a significant number of other jobs in the national economy that are consistent with the claimant's impairments and vocational factors -- age, education, and work experience.

Where a claimant cannot perform the full range of work in a particular category of work (very heavy, heavy, medium, light, and sedentary) listed in the Commissioner's regulations, due to nonexertional impairments such as depression, the ALJ must consider testimony of a VE.  In order to constitute substantial evidence upon which to base a denial of benefits, the testimony of a VE that there are jobs the claimant could perform must be in response to a hypothetical question which "capture[s] the concrete consequences of the claimant's deficiencies."  Hunt v. Massanari, 250 F.3d 622, 625 (8th Cir. 2001).  Testimony by a VE "based on hypothetical questions that do not encompass all relevant impairments cannot constitute substantial evidence to support the ALJ's decision."  Hillier v. Soc. Sec. Admin., 486 F.3d 359, 365 (8th Cir. 2007) (quotation omitted).  The question, however, need not include alleged limitations that the ALJ properly discredits.  Randolph v. Barnhart, 386 F.3d 835, 841 n. 9 (8th Cir. 2004).  Here the ALJ decided at step five that, based upon the VE's testimony, there were jobs in the economy that Plaintiff could perform.

## Weight Given Opinions of Medical and Other Sources

Plaintiff argues that the ALJ committed reversible error by failing to give proper weight to the opinions of Dr. Hall, Ms. Raboin (a mental health clinical nurse specialist), and Mr. Berger (a licensed clinical social worker), the latter two of whom treated Plaintiff on a regular basis. Plaintiff argues that as the counselors' assessments of Plaintiff's mental limitations were appropriately co-signed by Dr. Hall, there was no justifiable basis for assigning these reports little weight. Plaintiff argues that the ALJ erred in not explaining the weight he accorded Dr. Finder's opinion, and in according too much weight to the ME, because the ME never examined Plaintiff, testified by phone (without having heard Plaintiff's testimony), misread the evidence on certain important matters, and exhibited "an obvious intent to testify against the Plaintiff."

In reaching a decision about a claimant's disability, an ALJ is to consider objective medical evidence; opinions of medical sources, including both "acceptable medical sources" and other health-care providers; statements by the claimant; and information from other "non-medical sources." 20 C.F.R. § 416.912. The weight that the ALJ should give a medical opinion from accepted medical sources is governed by a number of factors, including the examining relationship, the treatment relationship, the length of the treatment relationship and frequency of examination, the consistency of the source's opinion, and whether the source is a specialist in the area. Id. § 416.927(d). The ALJ is to give a treating medical source's opinion on the issues of the nature and severity of an impairment controlling weight if such opinion "is well-supported by medically acceptable

33

clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the] case record." Id. § 416.927(d)(2).

The Commissioner's regulations define "acceptable medical sources" as licensed physicians; licensed or certified psychologists; and, for certain purposes, licensed optometrists, podiatrists, and qualified speech-language pathologists. Id. § 416.913(a). The regulations define "other sources" as medical sources, such as nurse-practitioners, physicians' assistants, chiropractors, and therapists; and non-medical sources, such as school teachers, counselors, developmental center workers, and public and private social welfare agency personnel, among others. Id. § 416.913(d).

On August 9, 2006, the SSA issued Social Security Ruling 06-03p to clarify how it considered decisions from sources who were not "acceptable medical sources." The ruling explains that information from "other sources"

> cannot establish the existence of a medically determinable impairment.
> Instead there must be evidence from an "acceptable medical source" for this
> purpose. However, information from such "other sources" may be based on
> special knowledge of the individual and may provide insight into the
> severity of the impairment(s) and how it affects the individual's ability to
> function.

SSR 06-03p, 2006 WL 2329930, at *2 (Aug. 9, 2006). The SSA explained its reasons for issuing the ruling:

> With the growth of managed health care in recent years and the emphasis
> on containing medical costs, medical sources who are not "acceptable
> medical sources," such as nurse practitioners, physician assistants, and
> licensed clinical social workers, have increasingly assumed a greater
> percentage of the treatment and evaluation functions previously handled
> primarily by physicians and psychologists. Opinions from these medical

34

sources, who are not technically deemed "acceptable medical sources" under our rules, are important and should be evaluated on key issues such as impairment severity and functional effects, along with the other relevant evidence in the file.

Id. at *3.

The SSA went on to clarify that opinions from "other sources" and "non-medical sources" who have seen the individual in their professional capacity should be evaluated using the same factors noted above for evaluating opinions from acceptable medical sources. Far from discounting such opinions, the ruling explained that "depending on the particular facts in a case, and after applying the factors for weighing opinion evidence, an opinion from a medical source who is not an 'acceptable medical source' may outweigh the opinion of an 'acceptable medical source.'" Id. at *5. The SSA concluded:

An opinion from a "non-medical source" who has seen the claimant in his or her professional capacity may, under certain circumstances, properly be determined to outweigh the opinion from a medical source, including a treating source. For example, this could occur if the "non-medical source" has seen the individual more often and has greater knowledge of the individual's functioning over time and if the 'non-medical source's' opinion has better supporting evidence and is more consistent with the evidence as a whole.

Id. at *6.

Recently, in Sloan v. Astrue, No. 06-3448, 2007 WL 2376767 (8th Cir. Aug. 27, 2007), the Eighth Circuit discussed the implications of SSR 06-03p. The ALJ in that case gave little weight to the claimant's treating licensed mental health social worker and treating LCSW, noting that they were not psychiatrists and "we don't get real excited

about social workers." The Court remanded the case for a determination of the proper weight to be accorded the opinions of these treating therapists in light of SSR 06-03p.

Here, the ALJ noted in his decision that Plaintiff's counselors were not "acceptable medical sources." He did not explain why he accorded their opinions, as well as those of Dr. Hall, "little weight," other than to state summarily that these opinions "were not consistent with the totality of the evidence." Tr. at 19. But here the Court finds scant support for the ALJ's finding that Plaintiff's mental condition "significantly improved" in treatment at the Arthur Center. Moreover, the ALJ appears to have discounted the counselors' notes, even though Dr. Hall co-signed them and confirmed, in his post-hearing submission, that he collaborated with Ms. Raboin and was very familiar with Mr. Berger's work. In addition, as Plaintiff argues, the ALJ did not explain the weight to be accorded to Dr. Finder's evaluation of Plaintiff.

Although the ME need not have examined Plaintiff or been present at the hearing to offer an opinion of Plaintiff's condition based on the record, see 20 C.F.R. 416.927(f) (explaining that the ALJ must consider all evidence from non-examining sources as opinion evidence, including statements from an ME consulted in connection with the ALJ hearing), the ALJ's complete reliance upon the ME's testimony here is problematic. After the ME acknowledged his mistake with respect to a GAF score of 50, and recognized that this score indicated a "serious" impairment, he did not explain why he did not credit the GAF assessments of 50 of Nurse Raboin, Mr. Berger, and Dr. Finder. Furthermore, the ME exhibited confusion over Dr. Finder's conclusions that Plaintiff's

ability to concentrate was significantly impaired and that Plaintiff was disoriented as to day and date.

Based upon his reading of the record and his reliance upon the ME's testimony, the ALJ did not factor into the RFC, and hence into the hypothetical he asked the VE, any mental impairment, except low intellectual functioning. Upon review of the record, the Court does not believe that the evidence supports a finding that within one year of the date Plaintiff filed for disability benefits, his only work-related mental impairment was low intellectual functioning. As such a remand is necessary here, as in <u>Sloan</u>, for the ALJ to reconsider and explain the weight due the opinions Nurse Raboin and Mr. Berger, in light of the new SSR on the matter. Upon remand, the ALJ should also consider and explain the weight to be given to Dr. Hall's, Dr. Finder's and Dr. Johnstone's opinions of Plaintiff's mental limitations. New testimony by a VE may be necessary, and other development of the record, as determined by the ALJ.

## CONCLUSION

Accordingly,

**IT IS HEREBY ORDERED** that the decision of the Commissioner is **REVERSED** and the case **REMANDED** to the Commissioner for further consideration.

*Audrey G. Fleissig*
AUDREY G. FLEISSIG
UNITED STATES MAGISTRATE JUDGE

Dated on this 28th day of September, 2007